IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| IRMA J. DAILEY, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:14cv00005 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By: Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Irma J. Dailey asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 401–422, 1381–1383f. This Court has authority to decide Dailey's case under

42 U.S.C. §§ 405(g) and 1383(c)(3), and her case is before me by referral under 28 U.S.C. §

636(b)(1)(B). On appeal, Dailey primarily argues that the Administrative Law Judge erred in

finding that some of her impairments were not severe and in assigning no functional limitations

to those impairments. *See generally* Pl. Br. 23–30, ECF No. 13. Having considered the

administrative record, the parties' briefs, and the applicable law, I find that substantial evidence

supports the Commissioner's final decision that Dailey is not disabled.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

1

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,

704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes

into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v.

Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474,

487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting

evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v.

Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585,

589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the

ALJ is not binding if it was reached by means of an improper standard or misapplication of the

law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a)

(governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs

follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in

sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an

impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Dailey protectively filed for DIB and SSI on May 31, 2011. *See* Administrative Record ("R.") 66, 76. She was 44 years old, *id.*, and had last worked as a part-time companion to her mother, who passed away in April 2009. *See* R. 227. Dailey alleged disability beginning March 23, 2011, due to a host of medical conditions, including diabetes, hypertension, monocular blindness and blurred vision, carpal tunnel syndrome ("CTS"), back and neck pain, and leg cramps.[1] *See* R. 223, 227. The state agency twice denied her applications. R. 86–87, 117–18.

Dailey appeared with counsel at a hearing before Administrative Law Judge Marc Mates ("the ALJ" or "ALJ Mates") on July 24, 2012. R. 25. She testified as to many of her alleged impairments and the limitations those impairments caused in her daily activities. *See* R. 30–39. A

---

[1] Dailey originally alleged disability beginning May 2009. *See* R. 222–23. The state agency amended Dailey's potential onset date to March 23, 2011, to reflect the fact that Administrative Law Judge R. Neely Owen ("ALJ Owen") denied her previous DIB and SSI applications in a written decision dated March 22, 2011. *See* R. 60, 223. The agency was entitled to "dismiss" Dailey's current disability claim to the extent that Dailey sought to "relitigate a time period for which [she] was previously found ineligible for benefits." *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476 n.4 (4th Cir. 1999).

Case 4:14-cv-00005-JLK-JCH   Document 16   Filed 02/04/15   Page 3 of 26   Pageid#: 726

vocational expert ("VE") also testified as to Dailey's ability to return to her past work or to perform other work existing in the national and regional economies. *See* R. 39–43.

In a written decision dated August 31, 2012, ALJ Mates concluded that Dailey was not entitled to disability benefits after March 23, 2011. R. 20. He found that Dailey suffered from three "severe impairments: loss of visual acuity in the right eye, migraines, and osteoarthritis," R. 13, but that these impairments were not presumptively disabling, R. 15–16. He also found that Dailey's diabetes and thyroid disorder were non-severe impairments because they generally were controlled by medication. *See* R. 13–14.

ALJ Mates next determined that Dailey had the residual functional capacity ("RFC")[2] to perform a limited range of light work.[3] *See* R. 16, 19. Specifically, he found that Dailey could (1) occasionally climb ramps and stairs; (2) never climb ladders, ropes, or scaffolds; (3) frequently balance; and (4) occasionally stoop, kneel, crouch, or crawl; but (5) should avoid "concentrated exposure" to noise and "even moderate exposure" to hazards. R. 16.

Relying on the VE's testimony, ALJ Mates concluded that Dailey was not disabled because she could return to her "past relevant work as a companion" as actually or generally performed. R. 18–19. ALJ Mates alternatively concluded that Dailey's age, education, work history, and RFC allowed her to perform other jobs available nationally or in Virginia, such as

---

[2] "RFC" is an applicant's maximum ability to work "on a regular and continuing basis" despite his or her impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record and must reflect the "total limiting effects" of the applicant's impairments. 20 C.F.R. §§ 404.1545, 416.945.

[3] "Light work" involves lifting no more than twenty pounds at a time, but frequently lifting or carrying objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can lift twenty pounds (and frequently lift or carry ten pounds) can perform light work only if he or she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

laundry folder, night cleaner, and office helper. R. 19. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

## III. Facts

*A.  Previous Factual Findings*

On March 22, 2011, ALJ Owen found that Dailey had a "history of uncontrolled diabetes mellitus II." R. 54 (citing R. 285, 290–92, 293–95, 297–99, 302–04). A year earlier, Dailey's primary care provider, Dr. Marian Hahesy-Calhoun, M.D., referred Dailey to Dr. Akta Mukherjee, M.D., an endocrinologist, to manage her diabetes. *See id.* (citing R. 285). Dailey reported that her blood-glucose levels were "up and down" on insulin. R. 285. Dr. Mukherjee diagnosed type II diabetes with neuropathy. She changed Dailey's insulin regimen and counseled her about the roles diet and exercise play in managing diabetes. *See* R. 54.

Dr. Mukherjee noted that Dailey's blood-glucose levels should stay between 70 and 140 mg/dL and that her A1c should be less than 7%.[4] *See id.* At the time, Dailey's blood glucose was 151 mg/dL with more than 11% A1c. *See* R. 285. Dailey's glucose and A1c levels remained high despite multiple medication adjustments between March 2010 and January 2011.[5] *See* R. 54–56

---

[4] A person with diabetes mellitus has too much glucose in her blood. *See* Mayo Clinic, *Diabetes*, http://www.mayoclinic.org/diseases-conditions/diabetes/basics/definition/con-20033091 (rev. July 31, 2014). The A1c test is used to gauge how well a patient is managing her diabetes overall. *See* Mayo Clinic, *A1c Test: Definition*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/definition/prc-20012585 (rev. Jan. 30, 2013). Results reflect the patient's average blood-sugar level for the past two or three months by measuring the percentage of hemoglobin coated with sugar. *See id.* "The higher [an] A1c level, the poorer [the] blood sugar control and the higher [the] risk of diabetes complications." *Id.*

[5] March 2010: random glucose 80–270 mg/dL with 9.4% A1c. *See* R. 290. May 2010: random glucose 77–277 mg/dL with 8.5% A1c. *See* R. 293, 297, 374. August 2010: random glucose 96–248 mg/dL with 8.1% A1c. *See* R. 297, 302. January 2011: random glucose 328 mg/dL with 8.9% A1c. *See* R. 306.

A1c levels of 8% and 9% denote estimated average blood-sugar levels of 183 mg/dL and 212 mg/dL, respectively. *See* Mayo Clinic, *A1c Test: Results*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/results/prc-20012585 (rev. Jan. 30, 2014).

5

(citing R. 290–92, 293–95, 297–99, 302–04). She often reported feeling fatigued, dizzy, or nauseous during this time. *See* R. 53, 286, 293, 297, 302. On January 17, 2011, Dr. Mukherjee also suspected that Dailey had Graves' disease when she reported sudden onset "symptoms of hyperthyroidism" including palpitations, nausea, weakness, and fatigue. *See* R. 55, 302–08.

Based on evidence available through February 9, 2011, ALJ Owen found that Dailey's diabetes and "hyperactive thyroid" were severe, but not disabling.[6] R. 51, 52, 54–56. He acknowledged that Dailey "experience[d] fatigue despite taking her [insulin] as prescribed," R. 53, but found that her glucose levels were improving under Dr. Mukherjee's care, R. 58. He also found that Dailey's thyroid medication "appeared to be helping her symptoms" as of her most recent doctor's visit. *Id.* ALJ Owen found that Dailey had the RFC to perform light work that did not require climbing ropes, ladders, or scaffolds; only occasionally involved stooping, kneeling, crouching, or crawling; and involved at most "moderate exposure to hazards such as machinery and heights." R. 52. Relying on a VE's testimony, ALJ Owen concluded that Dailey was not disabled because she could return to her past work as a cashier in a fast-food restaurant. R. 59.

B.    *Current Medical Evidence*

1.    *Treatment Records*

Dailey continued under Dr. Mukherjee's care from February 2011 to March 2012 during the period relevant to her current applications. *See* R. 306–09, 438–41, 442–45, 499–502, 504–07, 508–12 (Feb., Apr., June, Aug., Sept. & Nov. 2011); R. 513–16, 518–21 (Feb. & Mar. 2012). Dr. Mukherjee often adjusted Dailey's insulin in an effort to lower her A1c levels.[7] *See* R. 308,

---

[6] ALJ Owen also found that Dailey's right-eye blindness and "status-post carpal tunnel syndrome release" were severe, but not disabling, impairments. *See* R. 51, 52–59.

[7] On June 21, 2011, Dr. Mukherjee continued Dailey's insulin because Dailey reported that her glucose levels were "much better . . . in [the] 90–100 range." R. 442, 444. Dr. Mukherjee also continued Dailey's insulin on August 30, 2011, because Dailey reported that her glucose levels

6

440, 444, 502, 506–07, 511. Laboratory results show that Dailey's blood-glucose or A1c levels were above target in April, May, August, and November 2011.[8] *See* R. 369, 442, 472, 475, 504, 508, 513, 523. She occasionally reported feeling fatigued, dizzy, or nauseous during the same time. *See* R. 316, 340, 346, 442–43, 470, 471, 484.

On February 2, 2012, Dr. Mukherjee changed Dailey's diagnosis to type II diabetes "not controlled, with neuropathy" because Dailey's glucose and A1c levels were still too high. R. 516 ("Last A1c 9.9% and higher [glucose] numbers recently in the 200–300 range."). Dr. Mukherjee reiterated this diagnosis on March 29, 2012, and again instructed Dailey to increase her insulin. R. 521. Dailey's random glucose at 315 mg/dL was still well above target during a visit to Dr. Hahesy-Calhoun's office on May 15, 2012. *See* R. 601.

On April 25, 2011, Dr. Mukherjee observed that Dailey's thyroid was "doing better" on the maximum daily dose of Methimazole. R. 440. At their next visit on June 21, however, Dr. Mukherjee noted that Dailey was "still hyperthyroid" on the same dose. R. 444. She recommended that Dailey undergo radiation therapy to "help definitively treat her [G]raves" because her thyroid was "not controlled" on Methimazole. R. 444. Dailey underwent radiation to treat a "Toxic multinodular" thyroid goiter on August 9, 2011. *See* R. 457, 459, 500.

On March 29, 2012, Dr. Mukherjee noted that Dailey "remained hyperthyroid until" February 2012, at which time she discontinued Methimazole. R. 518. Dr. Mukherjee considered

---

were "OK," "mostly in the 100s," and "unchanged" since their last visit on June 21. R. 499, 502. Labs drawn the same day show Dailey's random glucose at 183 mg/dL with 11.3% A1c. R. 504, 523. Eleven percent A1c indicates an estimated average blood-sugar level of 269 mg/dL over the past two or three months. *See* Mayo Clinic, *A1c Test: Results*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/results/prc-20012585 (rev. Jan. 30, 2014). Dr. Mukherjee increased Dailey's insulin at their next visit on September 27, 2011. R. 506.

[8] April: 9.9% A1c. *See* R. 442. May: random glucose 183 mg/dL. *See* R. 369. August: random glucose 130 mg/dL with 11.3% A1c. *See* R. 504, 523. November: random glucose 201 mg/dL with 9.9% A1c. *See* R. 513, 523.

restarting Methimazole when Dailey reported "having some hyper[thyroid] symptoms off treatment" in March 2012.[9] *Id.*

Dailey first reported experiencing persistent headaches on May 18, 2011, during a visit to her primary-care provider's office. *See* R. 348. She reported sharp, shooting pain in her forehead, but denied nausea or vomiting. *Id.* Dr. Edwina Wilson, M.D., gave Dailey an injection of Torodol which caused "significant improvement in her migraine" symptoms. R. 349. Dailey saw Dr. Hahesy-Calhoun on May 25, 2011, to "discuss her migraines." R. 346. She reported experiencing "occasional nausea" that did not "seem to be tied to the headaches." *Id.* Dr. Hahesy-Calhoun prescribed a new migraine medication and ordered a CT scan of Dailey's head. R. 347. Those results were negative and unchanged compared to an August 2006 scan. R. 379.

On July 6, 2011, Dailey told Dr. Hahesy-Calhoun that she experienced "daily" migraines and that her condition was "not any better" on medication. R. 344. Dr. Hahesy-Calhoun increased Dailey's medication and referred her to a neurologist. *See* R. 345. Dailey returned to Dr. Hahesy-Calhoun's office on August 17, 2011, complaining of headaches "almost daily for six months." R. 466. She reported occasional vomiting, but expressly denied nausea. R. 467. Dr. Hahesy-Calhoun changed Dailey's medication and instructed her to follow up in two months.

Dailey saw a neurologist, Dr. Pavani Guntur, M.D., on November 22, 2011. R. 527. She reported experiencing three or four "abrupt onset" migraines a week, each lasting between thirty and forty minutes. *See id.* A neurological exam was within normal limits. *See* R. 529–30. Dr. Guntur diagnosed persistent headaches that were "most likely migrainous in nature." R. 531. He changed Dailey's medication and instructed her to follow up in three or four months. *Id.* Dailey returned to the neurologist's office on April 10, 2012. She reported having ten to fifteen

_____

[9] Medication lists produced after February 2012 do not include Methimazole. R. 600, 602, 627.

migraines a month, each lasting between thirty minutes and "several hours." R. 532. Dailey's headaches were less "intense," but not less frequent on her new medication. *See id.* Dr. Julio Ventura, M.D., recommended increasing or changing medications to reduce the number of headaches that Dailey experienced. R. 534. Dailey refused even though she understood that she could have an "improved [quality of life] with better migraine management." *Id.* Dr. Ventura instructed Dailey to follow up if her condition changed or if she had an adverse reaction to her medications. *See id.*

2.    *Medical Opinions*

On August 9, 2011, state-agency reviewer Dr. Josephine Cader, M.D., reviewed Dailey's medical records available through August 1, 2011. *See* R. 67–75. She found Dailey's diabetes to be a non-severe impairment because it was "controlled with treatment." R. 69, 70. In support, Dr. Cader cited Dailey's July 6, 2011, comment to Dr. Hahesy-Calhoun that her diabetes was "well controlled" at that time. *See* R. 69, 344. Dr. Cader's report does not mention Dailey's thyroid disorder. Dr. Cader concluded that Dailey could perform "medium work,"[10] except that she could never climb ropes, ladders, or scaffolds; only occasionally stoop, kneel, crouch, or crawl; and should avoid "concentrated exposure" to noise and "even moderate exposure" to hazards because of her severe migraine headaches and limited vision. R. 71–73.

State-agency reviewer Dr. David Williams, M.D., reconsidered Dailey's applications on November 3, 2011. *See* R. 91–103. He disagreed with Dr. Cader's opinion that Dailey could perform medium work because there was "no evidence to support" a finding that Dailey's "condition ha[d] improved since" ALJ Owen issued his decision on March 22, 2011. R. 97. Dr. Williams restricted Dailey to light work with the same environmental and other restrictions in

---

[10] Medium work involves lifting no more than fifty pounds at a time, but frequently lifting or carrying objects weighing twenty-five pounds. 20 C.F.R. §§ 404.1567(c), 416.967(c).

9

order to "align" Dailey's current RFC assessment with ALJ Owen's earlier finding. *See id.* Still, Dr. Williams agreed with Dr. Cader's opinion that Dailey's diabetes was now a non-severe impairment. *Compare* R. 70, 97, *with* R. 51, 54–55, 58. He did not explain this finding. *See* R. 97. Dr. Williams also did not mention Dailey's thyroid disorder. *See id.*

C.     *Dailey's Statements*

Dailey completed an Adult Function Report on August 8, 2011. *See* R. 238–45. On a typical day, Dailey woke up, took a bath, watched television, went for walks, and sometimes went to doctors' appointments. *See* R. 238. She reported some problems tending to her personal needs because of neck and back pain. R. 239. Dailey's family members helped her with the cooking, cleaning, yard work, and shopping because engaging in these activities made Dailey feel weak and dizzy. *See* R. 239–42. Dailey reported that back and neck pain affected her ability to sit, stand, bend, kneel, lift, and reach. R. 243. She estimated that she could lift five pounds and walk twenty-five feet before needing to stop and rest for fifteen minutes. *Id.* Dailey reported without explanation that she could not concentrate for "long" and generally did not finish what she started. *See id.*

In July 2012, Dailey testified that she felt lightheaded, dizzy, weak, and fatigued every day because her diabetes medications did not control her glucose levels. R. 30. Dailey said that her medications caused side effects identical to her diabetes symptoms, as well as tremors. *See* R. 33. On a typical day, Dailey woke up, took a bath, relaxed, tried to wash dishes, and sometimes went to doctors' appointments. *See* R. 36. Dailey's adult sons often finished washing dishes for her, at least in part because she could "hardly lift" more than a plate. *See* R. 35–36. Dailey estimated that she could sit for thirty minutes and stand and walk for ten minutes. R. 34. She

reported having migraines "just about every other day," and that her medication did "not really" help her symptoms. R. 32.

## IV. Discussion

Dailey primarily objects to ALJ Mates's finding that her diabetes and thyroid disorder are non-severe impairments. *See* Pl. Br. 23–25, 28–29. She argues that he overlooked contrary medical evidence, as well as her own testimony describing the intensity, persistence, and limiting effects of related symptoms such as dizziness, weakness, fatigue, and nausea. *See id.* at 24–25, 29. Dailey also argues that ALJ Mates's RFC does not accommodate the combined limiting effects of her severe and non-severe impairments, especially her "repeated complaints" of dizziness, weakness, fatigue, and nausea. *See id.* at 25, 26–28. She asks the Court to reverse the Commissioner's final decision and remand her case for further proceedings. *See id.* at 29.

A.    *Non-Severe Impairments*

At step two of the five-step disability evaluation process, the claimant must show that she suffers from a "severe medically determinable physical or mental impairment . . . or combination of impairments." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). This requires the ALJ to determine whether the claimant has a "physical or mental impairment" and, if so, the degree to which that impairment affects the claimant's physical or mental ability to perform "basic work activities." SSR 96-3p, 1996 WL 374181, at *1–2 (July 2, 1996) (citing 20 C.F.R. §§ 404.1520, 416.920). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques,"

42 U.S.C. § 423(d)(3), or "objective medical evidence,"[11] 20 C.F.R. §§ 404.1529(a), 416.929(a). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b).

The ALJ's severity analysis must take into account all medical and related evidence in the claimant's record. *See* SSR 96-3p at *1–2; 20 C.F.R. §§ 404.1529(c)(4), (d)(1), 416.929(c)(4), (d)(1); 20 C.F.R. §§ 404.1520(c), 416.920(c). Symptoms, such as pain or fatigue, will not be found to cause functional limitations unless the claimant "first establishes by objective medical evidence that he or she has a medically determinable physical or mental impairment(s) [that] . . . could reasonably be expected to produce the alleged symptoms." SSR 96-3p at *2. If the claimant clears this threshold, "the intensity, persistence, and limiting effects of the alleged symptom(s) must be considered along with the objective medical and other evidence in determining whether the impairment . . . is severe."[12] *Id.*

An impairment should be labeled "not severe only if it is a *slight abnormality* which has such a *minimal effect* on the [claimant] that it would not be expected to interfere" with a person's ability to work. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks omitted); *Waller v. Colvin*, No. 6:12cv63, 2014 WL 1208048, at *7 (W.D. Va. Mar. 24, 2014);

---

[11] Objective medical evidence is defined by regulation as "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a).

[12] This analysis may require the ALJ to determine "the degree to which [the claimant's] statements can be believed and accepted as true" given the objective medical and other evidence in the record. SSR 96-7p, 1996 WL 374186, at *2, *4 (July 2, 1996); *accord* SSR 96-3p, at *2 (citing SSR 96-7p). If the ALJ finds that the claimant's "symptoms cause a limitation or restriction having more than a minimal effect on [his or her] ability to do basic work activities, the [ALJ] must find that the impairment(s) is severe . . . even if the objective medical evidence would not in itself establish that the impairment(s) is severe." SSR 96-3p, at *2.

Case 4:14-cv-00005-JLK-JCH   Document 16   Filed 02/04/15   Page 12 of 26   Pageid#: 735

SSR 96-3p, at *1. This is not a difficult hurdle for the applicant to clear. *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999). Still, this Court must affirm the ALJ's non-severity finding if he applied the correct legal standard and his finding is supported by substantial evidence in the record. *See Meyer*, 662 F.3d at 704; *Owens v. Barnhart*, 400 F. Supp. 2d 885, 891 (W.D. Va. 2005).

1.    *ALJ Mates's Findings*

ALJ Mates found that Dailey's diabetes was a non-severe impairment. *See* R. 13–14. He appears to have rejected Dailey's testimony that her "uncontrolled" diabetes makes her feel "lightheaded, dizzy, weak, and tired on a daily basis" because Dailey "reported that her diabetes was well-controlled" on July 6, 2011. R. 13. ALJ Mates acknowledged "more recent treatment notes indicate that [Dailey's] diabetes was not entirely controlled," but noted that Dailey was "consistently" following up with Dr. Mukherjee and adjusting her medications. R. 14. Thus, "it [did] not appear" to ALJ Mates that Dailey's diabetes had more than a minimal affect on her ability to perform basic work activities. *Id.* ALJ Mates also found that Dailey's thyroid disorder was a non-severe impairment because it was controlled by medication. *Id.* In support, he cited the April 25, 2011, treatment note in which Dr. Mukherjee opined that Dailey was "doing better" on the maximum daily dose of Methimazole. *See id.* (citing R. 440).

2.    *Analysis*

Substantial evidence does not support ALJ Mates's finding that Dailey's diabetes and thyroid disorder were non-severe impairments. First, ALJ Mates did not mention ALJ Owen's finding that the same disorders were severe impairments on March 22, 2011, one day before the period for which Dailey now seeks benefits. *See* R. 13–14, 18, 51, 54–55, 223. Fourth Circuit precedent requires ALJ Mates to consider ALJ Owen's severity "finding as evidence and give it

13

appropriate weight in light of all relevant facts and circumstances" in Dailey's current record. AR 00-1(4), 2000 WL 43774, at *4 (Jan. 12, 2000) (citing *Albright*, 174 F.3d 473); *Marfield v. Astrue*, No. 2:09cv91, 2010 WL 3028941, at *13–14 (N.D. W. Va. June 1, 2010). In determining what weight to give ALJ Owen's finding, ALJ Mates also should have considered (1) whether a fact on which ALJ Owen's finding was based was subject to change over time; (2) the likelihood of such a change, considering the amount of time "between the period previously adjudicated and the period" now under review; and (3) the extent to which evidence not considered by ALJ Owen "provides a basis for making a different finding" on Dailey's current applications. AR 00-1(4), at *4; *Marfield*, 2010 WL 3028941, at *13.

ALJ Mates's written decision does not indicate that he properly weighed ALJ Owen's finding that Dailey's "uncontrolled diabetes" and "hyperactive thyroid" more than minimally impacted Dailey's ability to perform basic work activities as of March 22, 2011. *See* R. 13–14, 16–18. This was legal error. *Albright*, 174 F.3d at 477; *Marfield*, 2010 WL 3028941, at *13–14; *Carter v. Barnhart*, 217 F. Supp. 2d 703, 705–06 (W.D. Va. 2002). Absent evidence to the contrary, "common sense and logic dictate[] that" Dailey's diabetes and thyroid disorder did not resolve overnight. *Albright*, 174 F.3d at 477 (citing *Lively v. Sec'y of Health & Human Servs.*, 820 F.2d 1391, 1392 (4th Cir. 1987)). The current record contains no such evidence; on the contrary, it contains objective medical evidence that Dailey's glucose or A1c levels were above target in March, May, and August 2010; January, April, May, August, and November 2011; and February and May 2012. *See, e.g.*, R. 290, 293, 297, 302, 306, 369, 442, 475, 504, 508, 513, 516, 523, 601.

Second, the record does not support ALJ Mates's reasons for finding these impairments to be non-severe. ALJ Mates found that Dailey's thyroid disorder was non-severe because it was

14

"controlled by medication." R. 14. This finding contradicts Dr. Mukherjee's opinion that Dailey's hyperthyroidism was "not controlled" on medication in June 2011, her recommendation that Dailey undergo more aggressive treatment in August 2011, and her opinion that Dailey "remained hyperthyroid" until February 2012. *See* R. 444, 518, 521. In March 2012, Dr. Mukherjee noted that Dailey was still "having some hyper[thyroid] symptoms" after stopping Methimazole a month earlier. R. 518. ALJ Mates did not discuss this contrary medical evidence in his written decision. *See* R. 14, 16–18.

ALJ Mates found that Dailey's diabetes was non-severe because "on July 6, 2011, she reported that her diabetes was well-controlled." R. 13 (citing R. 344). Although ALJ Mates acknowledged that "more recent treatment notes indicate that [Dailey's] diabetes was not entirely controlled," he did not explain why Dailey's isolated self-assessment deserved more weight than the contrary medical evidence in her record. *See* R. 13–14. Dailey's comment conflicts with laboratory results showing that her glucose and A1c levels were above target throughout 2010 and 2011, as well as with Dr. Mukherjee's opinion that Dailey's diabetes was "not controlled" in February and March 2012. *See* R. 302, 369, 442, 472, 475, 504, 508, 513, 516, 521, 523. If ALJ Mates discredited these test results or Dr. Mukherjee's opinion, "he needed to both say so and to explain why."[13] *Smith v. Heckler*, 782 F.2d 1176, 1181 (4th Cir. 1986); *accord* 20 C.F.R. §§

---

[13] Contrary to the Commissioner's argument, ALJ Mates did not "explain[] that he found [Dailey's] diabetes to be a non-severe impairment because Dr. Mukherjee reported that [her] diabetes was controlled by her diet and medication regimen." Def. Br. 14 (citing R. 499, 504, 508). ALJ Mates very clearly explained that Dailey's diabetes was non-severe because Dailey once reported that the condition was "well-controlled" even though "more recent treatment notes" suggested that it was "not entirely controlled." R. 13.

Further, the pages to which the Commissioner cites document Dailey's subjective recollections of her glucose levels in August, September, and November 2011. *See* R. 499, 504, 508. Dailey's reports conflict with lab results and treating-source opinions that ALJ Mates did not specifically discuss in his written decision. The Commissioner points to no medical evidence, and I can find none, suggesting that Dailey's diabetes was controlled during the relevant period.

15

404.1527(c)(2), 416.927(c)(2). He did not mention them at all in his written decision. *See* R. 13–14, 16–18.

Of course, abnormal lab results and diagnoses are not evidence that Dailey's diabetes and thyroid disorder caused more than minimal functional limitations as required for those impairments to be considered severe. SSR 96-3p, at *2; *cf. Price v. Barnhart*, No. 7:04cv741, 2005 WL 3477547, at *6 (W.D. Va. Dec. 13, 2005) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1458 (4th Cir. 1990)) ("The mere diagnosis of a condition is not conclusive; any impairment must be accompanied by functional limitations that render the claimant unable to work."). The record contains evidence that these impairments could at least minimally interfere with Dailey's ability to perform basic work activities. In July 2012, for example, Dailey testified that her uncontrolled diabetes made her feel dizzy, weak, and tired every day.[14] *See* R. 13, 30. A year earlier, she reported that those symptoms interfered with her ability to complete basic household chores. *See* R. 238–41. Dailey also occasionally reported feeling dizzy, weak, tired, or nauseous throughout the relevant period. *See* R. 306, 316, 340, 346, 438–39, 442–43, 470, 471, 484, 499–500, 508, 514, 516, 518; *but see* R. 467, 485, 504, 513–14, 628 (expressly denying the same). She or her doctors attributed these symptoms to diabetes, migraine headaches, and hyperthyroidism or side effects of the medication used to treat it. *See* R. 306, 323, 340, 346, 354, 438, 442–43, 508, 518.

The Commissioner argues that Dailey's subjective statements "cannot provide a reliable basis" for finding that her diabetes and thyroid disorder were severe impairments because the ALJ properly discredited those statements. Def. Br. 15, ECF No. 15. According to the Commissioner, ALJ Mates found that Dailey's diabetes and thyroid disorder "could reasonably

---

[14] Dailey did not testify that her thyroid disorder caused any particular symptoms or functional limitations. *See* R. 33–34, 38.

be expected to produce" persistent dizziness, fatigue, weakness, and nausea, but that her statements describing those symptoms "were not fully credible because they were inconsistent with the objective medical evidence." *Id.* at 16, 16–19. It is not sufficiently clear that ALJ Mates made any such findings about Dailey's diabetes and thyroid disorder. *See Dunn v. Colvin*, 973 F. Supp. 2d 630, 639 (W.D. Va. 2013) (quoting SSR 96-7p, at *4) ("The ALJ's [credibility] determination must 'make clear to . . . any subsequent reviewers the weight the ALJ gave to the individual's statements and the reasons for that weight.'"). If he did, he certainly was not permitted to reject Dailey's statements describing her symptoms "solely because the available objective medical evidence [did] not substantiate" those statements. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). If anything, ALJ Mates rejected Dailey's testimony that her "uncontrolled" diabetes *ever* makes her feel "lightheaded, dizzy, weak, and tired" because she once reported that her diabetes was "well controlled." R. 13–14. The record does not support that finding. *See*, *e.g.*, R. 316, 340, 442–43, 470, 471, 484, 508, 516, 518 (Dailey reporting that she felt dizzy, weak, or tired); R. 516, 521 (diagnosing uncontrolled diabetes).

In social security cases, courts review errors to determine whether they could have changed the Commissioner's final decision that the claimant is not disabled. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam) ("[A]ny error is reviewed under the harmless error doctrine. Thus, if the decision 'is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.'") (quoting *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (explaining that the Fourth Circuit does not require procedural perfection, and finding that the claimant did not identify any "evidence not considered by the Commissioner that might have changed the outcome of his disability claim");

Case 4:14-cv-00005-JLK-JCH   Document 16   Filed 02/04/15   Page 17 of 26   Pageid#: 740

*Kersey v. Astrue*, 614 F. Supp. 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error."). Errors at step two are harmless when the ALJ considers the effects of all of the claimant's impairments when making his RFC determination. *See Brooks v. Astrue*, No. 5:10cv104, 2012 WL 1022309, at *11 (W.D. Va. Mar. 26, 2012). Although ALJ Mates did not mention Dailey's diabetes or thyroid disorder after step two, he did discuss at step four Dailey's testimony that her medications "make her dizzy, lightheaded, weak, and occasionally shaky." R. 16. These are the same diabetes-related and hyperthyroid-related symptoms that Dailey says render her unable to work. *See* Pl. Br. 25, 26, 28, 29. In his step four RFC analysis, ALJ Mates properly accommodates those symptoms to the extent that he found Dailey's complaints were consistent with the medical and other evidence in her record. *See* R. 16–18.

ALJ Mates had good reason to question Dailey's testimony that she experienced constant, debilitating dizziness, fatigue, weakness, and nausea. For example, ALJ Mates correctly identified several instances after March 22, 2011, where Dailey denied experiencing those symptoms, failed to report those symptoms, or reported that she only occasionally experienced those symptoms. R. 17 (citing R. 328, 348, 534, 628); *see also* R. 467, 485, 504, 513–14. This inconsistency alone supports ALJ Mates's finding that Dailey's symptoms and medication side effects were not as severe as she claimed. R. 13, 16–17; *see Bishop*, 583 F. App'x at 67 (substantial evidence supported ALJ's credibility finding where he "cited specific contradictory [evidence] and averred that the entire record had been reviewed"); *cf. Chestnut v. Colvin*, No. 4:13cv8, 2014 WL 2967914, at *3 (W.D. Va. June 30, 2014) (Kiser, J.) (finding it "reasonable to expect" that a claimant would accurately report allegedly debilitating symptoms to her healthcare

18

providers, and noting that the claimant's failure to do so supported the ALJ's decision to give her treating physician's opinion less than controlling weight).

B.      *Combined Limitations*

Dailey next argues that "the ALJ failed to consider the combination of all [her] impairments and their medications" when formulating her RFC. Pl. Br. 28. She objects to the ALJ's RFC determination because it does not reflect her "repeated complaints" of dizziness, fatigue, and nausea. *See* Pl. Br. 25, 28.

A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). "It is an administrative assessment made by the Commissioner based on all the relevant evidence in the [claimant's] record," including objective medical evidence, medical-source opinions, and the claimant's own statements. *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam); *accord* SSR 96-8p, 1996 WL 374184 (July 2, 1996). The RFC must reflect the combined limiting effects of impairments "supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints." *Carter v. Astrue*, No. 3:10cv510, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011), *adopted by* 2011 WL 2693392 (July 11, 2011); *accord* 20 C.F.R. §§ 404.1545(e), 416.945(e). Although this Court reviews the RFC determination for substantial evidence, the claimant bears the burden of showing that an omitted limitation should have been included. *Lowery v. Comm'r of Soc. Sec.*, No. 4:10cv47, 2011 WL 2648470, at *4 (W.D. Va. June 29, 2011) ("The claimant's RFC is addressed at the fourth step in the sequential evaluation, where the burden of proof remains on the claimant."), *adopted by* 2011 WL 2836251 (July 14, 2011) (Kiser, J.).

ALJ Mates found that Dailey could perform light work, except that she could never climb ropes, ladders, or scaffolds; could only occasionally stoop, kneel, crouch, crawl, or climb stairs and ramps; and should avoid "concentrated exposure" to noise and "even moderate exposure" to hazards. R. 16. This RFC is consistent with the law and fully supported by the record. First, ALJ Mates discussed Dailey's medical records, her subjective statements, medical-source opinions, and ALJ Owen's earlier RFC finding.[15] *See* R. 13–14, 16–18. ALJ Mates also explained that his RFC determination—which "is slightly more restrictive" than ALJ Owen's RFC finding—was supported by Dailey's "conservative" treatment, "the lack of significantly adverse objective findings" on diagnostic images of Dailey's neck and spine, Dr. Williams's RFC assessment, and the fact that "[n]o treating or examining source ha[d] imposed any limitations on [Dailey] or suggested that [she] is disabled." R. 18.

Second, ALJ Mates did not simply adopt Dr. Williams's RFC assessment. *See* Pl. Br. 23–24. He explained that he gave Dr. Williams's opinion significant weight because it was consistent with the record as a whole. R. 18. *Cf. Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (ordering sentence-four remand where ALJ did not explain the "apparently very high" weight he gave to a state-agency reviewer's opinion or the reasons for that weight). This is a legitimate factor to consider when weighing opinions from non-examining physicians. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).

Dailey objects to Dr. Williams's opinion—and ALJ Mates's "irrational" decision to credit it—because the records available to Dr. Williams were "egregiously incomplete." Pl. Br. 24. This argument ignores the fact that ALJ Mates weighed Dr. Williams's opinion against the

---

[15] ALJ Owen determined that Dailey's diabetes and hyperthyroidism were severe impairments, and he incorporated into his RFC the credible limitations caused by these impairments. *See* R. 52–53, 54–56, 58–59.

record as it existed in August 2012. *See* R. 18. Moreover, treatment records produced after

November 2011 contain much the same information that was available to Dr. Williams, which

provided a representative picture of Dailey's condition throughout the relevant period.

ALJ Mates's RFC restricts Dailey to a limited range of light work. *See* R. 15, 18–19.

"Light work" involves lifting no more than twenty pounds and frequently lifting or carrying

objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can lift that

much weight can perform light work only if she also can "do a good deal of walking or standing,

or do some pushing and pulling of arm or leg controls while sitting." *Hays*, 907 F.2d at 1455 n.1;

*accord Lafferty v. Colvin*, No. 4:13cv49, 2015 WL 156772, at *3 (W.D. Va. Jan. 13, 2015)

(Kiser, J.). Dr. Williams opined that Dailey could meet these requirements based on the evidence

available in November 2011. *See* R. 15, 112.

The ALJ may rely on a non-examining physician's opinion when it is consistent with the

record, *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984), and Dailey does not point to any

objective medical or other credited evidence that conflicts with Dr. Williams's opinion. For

example, a February 2012 MRI of Dailey's lumbar spine showed only "some facet arthropathy"

and a "mildly" degenerated bulging disc at L4-5. R. 495. An earlier MRI of Dailey's cervical

spine was unremarkable. R. 398. Physical exams were consistently within normal limits, even

when Dailey complained of neck or back pain. *See* R. 340–41, 354–55, 393, 417–18, 529–30,

532–34, 601, 609, 610–11, 628.

ALJ Mates had good reason to question Dailey's reported functional limitations. In July

2012, Dailey testified that she could "hardly lift" more than a plate and could only stand or walk

for "[m]aybe about ten minutes." R. 34, 35; *accord* R. 622 (Dailey's June 2012 statement that

she cannot work because of "back pain [that] affects her ability to lift and walk"). A year earlier,

Dailey reported that she could lift five pounds and walk "about 25 feet" before needing to stop and rest. R. 243. But Dailey never reported such severe limitations to her healthcare providers. *Cf. Chestnut*, 2014 WL 2967914, at *3 (finding it "reasonable to expect" that a claimant would accurately report allegedly debilitating symptoms to her healthcare providers). Nor is there any evidence that she objected when Dr. Hahesy-Calhoun reminded Dailey to exercise more in December 2011. R. 605; *cf. Sowers v. Colvin*, No. 4:12cv29, 2013 WL 3879682, at *4 (W.D. Va. July 26, 2013) (Kiser, J.) (claimant's inconsistent statements about his level of pain provided substantial support for ALJ's adverse credibility finding). Dailey's testimony that she can "hardly lift" more than a few pounds also is inconsistent with treatment notes showing that she had full strength and range of motion in both upper extremities. *See* R. 393, 394, 530, 534. On this record, ALJ Mates reasonably found that "limited objective abnormalities" undermined Dailey's complaints of disabling osteoarthritis, pain, and functional limitations. R. 17–18.

Dailey does not seriously contest that finding. *See generally* Pl. Br. 23–29. Rather, she argues that ALJ Mates's RFC determination is inadequate because it does not accommodate her fatigue, nausea, dizziness, and need to attend doctor's appointments. *See* Pl. Br. 25, 28. Her RFC does not include restrictions on workplace performance or attendance because ALJ Mates discredited Dailey's statements describing the intensity, persistence, and limiting effects of her migraines and medication side effects. *See* R. 16–18. Contrary to both parties' arguments, *see* Pl. Br. 29; Def. Br. 16, ALJ Mates did not discredit those statements solely because they were not substantiated by medical signs and laboratory findings, *see* R. 13–14, 17–18. He gave several legitimate reasons, with supporting references to the record, for discrediting Dailey's claim that she cannot work at all. *See Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) (finding no legal error where ALJ did the same).

For example, ALJ Mates found that Dailey's migraines had been "treated conservatively" and that she once refused additional treatment against medical advice. R. 18. While there is "no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment," *Gill v. Astrue*, No. 3:11cv85-HEH, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012), "[a]n unexplained inconsistency between the claimant's characterization . . . of her condition and the treatment she sought to alleviate that condition" can bear on the claimant's credibility, *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (citing the current 20 C.F.R. § 416.929(c)(3)). Dailey claims that she suffers debilitating migraines unabated by medication. In April 2012, however, Dailey reported that "the intensity of her migraines ha[d] improved" on a new medication. R. 532. She then refused to adjust that medication despite Dr. Ventura's insistence that it would further improve her quality of life. *See id.* Dailey offers no reason—and I can find none in the record— that might explain her refusal to follow Dr. Ventura's advice. Thus, it was not unreasonable for ALJ Mates to find that Dailey's migraines were not as debilitating as alleged.

ALJ Mates also found that none of Dailey's treating or examining physicians "ha[d] imposed any limitations" on her, let alone "suggested that [she] is disabled." R. 18. Information that a treating or examining source provides about a claimant's symptoms is "an important indicator" of the intensity, persistence, and limiting effects of symptoms, such as fatigue or nausea, that can be "difficult to quantify" with objective medical evidence. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Thus, a healthcare provider's failure to impose "symptom-related functional limitations and restrictions," *id.*, can weigh against the claimant's complaints of debilitating symptoms. 20 C.F.R. §§ 404.1529(c)(3)(vii), 416.929(c)(3)(vii); *Hicks v. Colvin*, No. 7:12cv618, 2014 WL 670916, at *6 (W.D. Va. Feb. 20, 2014) ("Finally—and significantly—the ALJ noted that the claimant's allegations of totally disabling symptoms were unsupported by any

23

restriction placed on her by her treating physicians."). Although doctors documented Dailey's reports that she felt dizzy, weak, tired, or nauseous, the record contains no evidence of any healthcare provider limiting Dailey's activity or questioning her ability to work after March 22, 2011. *See generally* R. 306–09, 438–78, 499–524 (Dr. Mukherjee's notes); R. 344–55, 466–67, 598–611, 627–28 (Dr. Hahesy-Calhoun's notes); R. 527–34 (Dr. Guntur's and Dr. Ventura's notes).

This evidence provides ample support for ALJ Mates's RFC assessment. His reliance on the VE's testimony in response to a hypothetical question reflecting this RFC, *see* R. 18–20, 40–41, was also proper. *See Hines*, 453 F.3d at 566 (noting that "proper" hypothetical questions must "fairly set out all of [the] claimant's impairments"). The VE testified that a person with Dailey's vocational profile and this RFC could perform specific light jobs, such as laundry folder, night cleaner, and office helper. *See* R. 40–41. Dailey argues that the hypothetical was inadequate because it did not reflect her complaints of dizziness, weakness, fatigue, and nausea. *See* Pl. Br. 25–26. In fact, ALJ Mates did ask the VE about Dailey's ability to work if he "fully" credited her testimony that, among other things, "she gets migraine headaches on a daily basis . . . [and] experiences symptoms from a combination of her impairments that would interfere with concentration, pace, and task performance more than two days month." R. 41–42. ALJ Mates gave specific and legitimate reasons, supported by substantial evidence in the record, for discrediting Dailey's testimony on those points. *See* R. 16, 18. The VE testimony upon which ALJ Mates ultimately relied was in response to a hypothetical question that "fairly set out all of [Dailey's] impairments" that are supported by the objective medical evidence and her credible complaints. *Hines*, 453 F.3d at 566.

Dailey does not object to the VE's opinion that a person with the RFC that ALJ Mates described could perform these particular jobs or to ALJ Mates's finding that these jobs exist in significant numbers nationally and in Virginia. *See* Pl. Br. 25–28. I find that the Commissioner's final decision that Dailey is not disabled is supported by substantial evidence. *See Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002) (holding that a VE's reliable testimony provides substantial evidence to support the Commissioner's final decision).

## V. Conclusion

The ALJ erred at step two in finding that Dailey's diabetes and hyperthyroidism were not severe impairments. This error was harmless because the ALJ considered and properly assessed, at step four, the side effects of Dailey's medications, which Dailey described as causing symptoms and functional limitations that were nearly identical to those caused by her diabetes and hyperthyroidism. Thus, despite the ALJ's error at step two, his RFC determination and other outcome-determinative findings are supported by substantial evidence. Accordingly, I recommend that the Court **DENY** Dailey's motion for summary judgment, ECF No. 12, **GRANT** the Commissioner's motion for summary judgment, ECF No. 14, and **DISMISS** this case from the docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 4, 2015

Joel C. Hoppe
United States Magistrate Judge

Case 4:14-cv-00005-JLK-JCH   Document 16   Filed 02/04/15   Page 26 of 26   Pageid#: 749